UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

————————————————————————

| | |
|---|---|
| THOMAS GAMMELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | )   Civil Action No. |
| v. | )   06-40226-FDS |
| | ) |
| PRUDENTIAL INSURANCE COMPANY | ) |
|  OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

————————————————————————)

MEMORANDUM AND ORDER ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT

SAYLOR, J.

This is a dispute concerning the denial of long-term disability benefits. The matter arises

under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et*

*seq*. The central legal issue presented is whether the Court should review that denial *de novo*, or

give deference to the plan administrator's decision.

Plaintiff Thomas Gammell was covered by a long-term disability plan as a benefit of his

employment with Digital Equipment Corporation, to which Hewlett-Packard Company is the

successor-in-interest. Defendant Prudential Insurance Company of America is the claims fiduciary

and insurer for the plan. Gammell made a claim for benefits based on a disability resulting from a

closed-head injury sustained in a bicycle accident in 1987. Prudential initially approved

Gammell's claim for long-term disability benefits in February 1990. Gammell continued to receive

benefits for more than 10 years, with periodic reviews by Prudential approximately every two

years to verify his ongoing total disability.

In December 2000, a claimant questionnaire completed by Gammell prompted a new round of medical evaluations and renewed scrutiny of Gammell's medical records, ultimately leading Prudential to terminate his long-term disability benefits effective November 2002. After an unsuccessful appeal to Prudential, Gammell filed this action.

Pending before the Court are the parties' cross-motions for summary judgment. For the reasons set forth below, both motions will be denied.

## I.      Statement of Facts

The following facts are undisputed unless otherwise noted.

### A.      Gammell's Employment

Plaintiff Thomas Gammell is a resident of Fitchburg, Massachusetts. He began working for Digital Equipment Corporation in 1968.

As an employee benefit, Digital established a long-term disability plan in which qualified employees were allowed to participate. The group long-term disability policy was issued to Digital by defendant Prudential Insurance Company of America, which both insured and administered the plan.[1]

### B.      Initiation of Disability Benefits

After suffering a head injury in a bicycle accident on June 30, 1987, Gammell was diagnosed with post-concussive syndrome of organic origin and a possible seizure disorder. (Administrative Record ("AR") at 75). He states that from the date of the accident to the present, he has suffered from daily headaches, dizziness, fatigue, reduced concentration, and diminished

---

[1] At some point, defendant Hewlett-Packard Company succeeded Digital for purposes of the plan at issue.

problem-solving and decision-making abilities.  Although he attempted to return to work after the

accident, Gammell contends that his medical condition prevented him from performing his job

duties.  His last day of full-time employment at Digital was May 24, 1989.[2]  Following the

accident, Gammell applied for and was granted short-term disability benefits.  His disabling

conditions were identified at the time as memory loss, headaches, depression, post-concussive

disorder, and a seizure disorder.

On November 13, 1989, Gammell applied for benefits pursuant to Digital's long-term

disability plan.  Prudential approved the application on February 23, 1990, with benefits

retroactive to November 23, 1989.  Gammell received benefits under the policy's "Total

Disability" provision, which provides as follows:

> "Total Disability" exists when Prudential determines that all of these conditions are
> met
> (1)      Due to Sickness or accidental injury, both of these are true
> >    (a)      You are not able to perform, for wage or profit, the material and
> >              substantial duties of your occupation
> >    (b)      After the Initial Duration of a period of Total Disability, you are not
> >              able to perform for wage or profit the material and substantial
> >              duties of any job for which you are reasonably fitted by your
> >              education, training or experience.  The Initial Duration is shown in
> >              the Schedule of Benefits
> (2)      You are not working at any job for wage or profit
> (3)      You are under the regular care of a Doctor

(AR at 12) (lack of punctuation in original).  Because Prudential paid Gammell disability benefits

throughout the "Initial Duration," in order to continue to receive benefits he must demonstrate

that he is not able to perform the material and substantial duties of "any job" for which he is

reasonably fitted.  (*Id.*).

---

[2] On January 17, 1990, Gammell returned to work at Digital on a part-time basis; however, on May 2,
1990, he left that position and has not returned to work.

### C.    Social Security Disability Benefits

In May 1990, Prudential instructed Gammell that, under the terms of his plan, he was required to apply for Social Security Disability Income ("SSDI") benefits.  (AR at 73).  His application was initially denied in July.  (AR at 77).  However, with the help of a Social Security assistance agency paid for by Prudential, that denial was reversed by an Administrative Law Judge in November 1991 after an administrative hearing.  In his decision, the ALJ noted that Gammell had undergone neuropsychological testing in 1989 and 1990.  In comparing the tests, the ALJ concluded that his "intelligence range had improved significantly in both verbal and performance areas, as he apparently recovered premorbid function levels.  On the other hand, his measured memory functions decreased significantly; this loss was thought to be secondary to either organic brain damage or depression . . . ."  (AR at 117).  He found that the medical evidence established that Gammell had "severe post-concussion syndrome" and "severe affective disorder with major depression, as well as a possible bipolar disorder."  (AR at 118).   The ALJ concluded that Gammell "clearly cannot return to that very demanding and stressful work now nor can he do any other work."  (AR at 117).  Accordingly, he found that Gammell had a "severe impairment" and was "disabled" within the meaning of the Social Security Act, and was therefore entitled to social security disability benefits.  (AR at 116-18).

Pursuant to the plan, Prudential reduced Gammell's long-term disability payments in the amount of the SSDI benefits that he received.

### D.    Review of Gammell's Disability Status

After Gammell began receiving long-term disability benefits, Prudential reviewed his disability approximately every two years to determine whether his condition had improved.  (AR

4

at 146, 147).  It continued to pay Gammell benefits for more than ten years.

On December 4, 2000, Prudential notified Gammell that the handling of his disability claim had been transferred to Carol Ann Matikiewicz in its Plymouth Meeting, Pennsylvania, office. (AR at 152).  Matikiewicz requested that Gammell provide her with a completed claim questionnaire and an authorization for the release of medical records in order to assist her in the claim transfer.  Gammell completed the questionnaire and authorization on December 7, 2000. On the questionnaire, he stated that he suffered from "headaches, poor memory, dizzyness [*sic*], depression, problems with vision, high blood pressure, [and] concentration."  (AR at 157).  He also reported that he couldn't remember anything, had "problems keeping appointments," and gets headaches when reading.  (AR at 158, 160).

However, Gammell's responses to the questionnaire also suggested at least some functionality in the activities of daily living.  He checked boxes on the form indicating that he (1) prepares his own meals (breakfast and lunch); (2) maintains a valid driver's license and drives five times per week at distances of up to 30 miles; (3) performs housework, including laundry, vacuuming, dishwashing, lawn care, and removal of trash and recycling for two hours daily; and (4) shops for food unassisted on a monthly basis.  (AR at 159-60).  In addition, Gammell stated that he liked to hunt with a bow and arrow, was "trying to learn wood carving and bee keeping," and was active in the Worcester County Beekeepers, Mid-State Antique Auto Club, and the Church of the Good Shepherd.  He stated that at his church, he unloaded Christmas trees, took the elderly food shopping, and assisted them with banking and paying bills as a volunteer on an as-needed basis.  (AR at 160-61).  He also reported that he had "joined a wood carving club, we meet Tuesday nights from 7 to 9."  (AR at 162).

When asked on the form whether he could return to work, Gammell responded: "No – I gen. don't feel good, when I have to do simple tasks or even hobbies that require any concentration I always get a headache. Knowing this I feel stressed before I even start." (*Id.*).

After reviewing the questionnaire, Matikiewicz wrote a claim summary, dated April 13, 2001. In that summary, she reviewed the claim history and stated that "[t]here is very little objective evidence to support the claimant's complaints of a seizure disorder and his emotional and cognitive difficulties. He is very active. It is unclear why he cannot work. Will obtain office notes from his treatment providers and after they are reviewed will determine next activity." (AR at 165).

On April 16, Prudential requested updated medical records from Gammell's treating physicians, Dr. Piamarie Ballarin-Feldman and Dr. Francis D'Ambrosio. Dr. Ballarin-Feldman is a family care physician who formerly shared her practice with Dr. Robert J. Roy, the primary care physician who had initially treated Gammell after the injury; Dr. D'Ambrosio is Gammell's ophthalmologist. In response, Prudential received records from Dr. Ballarin-Feldman and an office note from Dr. D'Ambrosio. On April 21, Dr. Ballarin-Feldman completed a Physical Capacities Evaluation and a Mental Residual Functional Capacity Assessment ("MRFC") in which she stated that Gammell suffered from "permanent cognitive deficits following closed head trauma from 1987" and that he had achieved his maximum medical improvement as of "several years ago." (AR at 425). Using the forms' check boxes, Dr. Ballarin-Feldman indicated that Gammell was moderately limited or markedly limited in several areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (AR at 426-27).

Matikiewicz reviewed Dr. Ballarin-Feldman's notes and concluded that there was little

medical documentation to support the conclusion that Gammell had multiple areas of "marked limitation," so she decided to refer the claim file for review.  (AR at 173).  On August 24, Prudential referred the claim to Dr. Daniel LoPreto, Ph.D.  Dr. LoPreto is a clinical psychologist employed by IMX Medical Management Services, a provider of independent medical evaluations. In her referral, Matikiewicz provided a brief summary of Gammell's claim and medical history, including the following:

> On December 7, 2000 the claimant completed an[] ADL form noting that he still has headaches, depression, HTN, visual problems and problems with concentration.  He does not take any medication for seizures.  The claimant states that he is only able to read 30 minutes because he gets headaches when he reads. He is very active, he is a beekeeper with the Worcester County Beekeepers, belongs to an Antique Auto Club, is able to unload Christmas trees, assists the elderly, and is able to drive and shop.  He has also taken a woodcarving class.

> There is very little objective evidence to support the claimant's complaints of a seizure disorder and has [*sic*] emotional and cognitive difficulties.  He is very active.  It is unclear why he cannot work.

> Your comments would be appreciated.

(AR at 428).

Dr. LoPreto reviewed Gammell's medical records, but did not meet with him.  He then drafted a clinical case review, dated August 30, that briefly describes the medical records he reviewed and what those records reported, and draws conclusions based on those records. Specifically, Dr. LoPreto concluded the following:

> I am unable to find evidence of a mental condition or neurological impairment of such severity in the present that would preclude gainful employment in some capacity.

(AR at 431).  Dr. LoPreto appeared to interpret Gammell's responses to the questionnaire similarly to Matikiewicz, ultimately finding that neither testing data nor "Mr. Gammell's own self-

report of his daily activities as contained on the recent Claimant Questionnaire" supported the existence of impairment or post-concussive syndrome. (*Id.*).

On August 31, Prudential forwarded Dr. LoPreto's case review to Dr. Ballarin-Feldman and inquired whether she agreed with his conclusion. On September 24, she responded by letter that Gammell is "able to carry on activities of daily living, but finds great difficulties with any type of multi-tasking. At times, his depression interferes with his ability to even complete sometimes simple tasks, as he has lack of concentration. For this reason, Mr. Gammell, I feel remains disabled from his post concussive syndrome." (AR at 433).

On September 26, Prudential asked Dr. LoPreto to review Gammell's claim file again in light of Dr. Ballarin-Feldman's September 24 letter and to provide comments. His follow-up case review, dated October 1, states:

> Dr. Ballarin-Feldman has not provided any additional objective data which would compel me to alter my initial opinion. Alleged "lack of concentration" satisfies only one of multiple criteria required for a diagnosis of a Mood Disorder. Additionally, even the existence of [a] legitimate mood disorder fails to necessarily imply a disability. While Mr. Gammell may in fact "find great difficulty in multi-tasking," such a deficit would not preclude gainful employment in some capacity, albeit perhaps not in his former one.

(AR at 437).

On October 4, Prudential sought a vocational assessment from Louis Szollosy, a senior vocational consultant. Like Dr. LoPreto, Szollosy did not meet with Gammell. In performing his assessment, Szollosy relied on the Physical Capacities Evaluation and MRFC forms completed by Dr. Ballarin-Feldman in April 2001 and Dr. LoPreto's report from October 2001. Szollosy concluded that Gammell was qualified to work as a shipping order clerk, routing clerk, or dispatcher. (AR at 442-43).

8

In an Addendum Report dated November 5, Dr. LoPreto recommended that in order to determine the severity of Gammell's alleged neuropsychological deficits, Prudential should obtain a current neuropsychological evaluation, including MMPI-2 and TOMM testing. (AR at 445). On December 6, Prudential engaged Perspective Consulting, Inc., to coordinate Gammell's independent neuropsychological testing. Perspective Consulting scheduled Gammell for testing with Dr. Michael Lavoie, Ph.D., at UMass Memorial Hospital in Worcester, Massachusetts, in February and May 2002. Dr. Lavoie tested multiple functions (cognitive/intellectual, attention and concentration, language, learning and memory, visuospatial/construction, executive and reasoning, and affective) by administering more than twenty different tests. In addition to these tests, Dr. Lavoie also reviewed documentation provided by Prudential.[3] Dr. Lavoie concluded the following:

> In general, test results indicate that Mr. Gammell is demonstrating a diminished initial encoding of information and that he is vulnerable to a degree of overload when attempting to process lengthy and more complex types of information. In addition, Mr. Gammell is demonstrating a degree of psychomotor slowing, and motor dysfluency as well as findings suggestive of weaknesses in right hemispheric functioning. In addition, measures of mood and affect reveal the presence of a significant degree of depression. . . . At this time, full delineation and confirmation of any diagnosis is very difficult to establish with any degree of certainty. It is important to note that Mr. Gammell did not demonstrate any deficit that was disproportionate with the severity of his injury or illness, be it organicity or depressive disorder. . . . Mr. Gammell does display deficits in functioning, however, it is not entirely clear whether this is due to organic brain disorder or to the significant level of depression that he is currently experiencing.

(AR at 475, 477).

Dr. LoPreto then reviewed Dr. Lavoie's findings and drafted a second Addendum Report dated June 20, 2002. Dr. LoPreto concluded that "while Mr. Gammell may be demonstrating

---

[3] It is unclear from the record exactly what documentation Prudential provided Dr. Lavoie.

'mild difficulties on tasks measuring sustained, selective, divided and focused attention and concentration functioning for verbal material of increasing length and complexity,' along with a slowed 'general speed of responding,' there is no evidence that these mild impairments would preclude successful occupational functioning in all capacities."  (AR at 489).  Dr. LoPreto also completed a MRFC and concluded that Gammell was either not limited or not significantly limited in most categories.  (AR at 502).[4]

On July 8, Matikiewicz requested that Szollosy draft an addendum to his vocational assessment based on the MRFC that Dr. LoPreto completed.  Szollosy concluded that Gammell was still able to hold a job where the exertion level was sedentary through medium, and repeated his suggestion that Gammell could work as a shipping order clerk, a routing clerk, or a dispatcher. (AR at 219-24).

In mid-July 2002, Dr. LoPreto contacted Dr. Lavoie and requested that he review Szollosy's vocational assessment and provide an addendum with his thoughts on the assessment. In his addendum, Dr. Lavoie stated that "the list of alternative occupations [in the vocational assessment] would be ones that the claimant would be capable of performing with all documented deficits and strengths as identified in the Neuropsychological Evaluation Report completed on the claimant in February and May of 2002 as well as with the vocational assessment report from July 8, 2002. . . .  The findings from the neuropsychological assessment do not preclude the claimant from performing these listed occupations."  (AR at 507).

---

[4] Dr. LoPreto did find Gammell "moderately limited" in the following three categories: (1) the ability to understand and remember detailed instructions; (2) the ability to carry out detailed instructions; and (3) the ability to maintain attention and concentration for extended periods.  (AR at 502).  All prior MRFCs relied on by Prudential had been completed by Gammell's treating physician, Dr. Ballarin-Feldman.

On August 1, Prudential sent an updated case review to Dr. Ballarin-Feldman and Dr. Ungerer, Gammell's psychiatrist since 1991, asking them to indicate on the enclosed forms whether they agreed with Prudential's conclusion that Gammell was "capable of gainful employment."  On August 12, 2002, Dr. Ballarin-Feldman returned the form having checked the "yes" line, indicating that she was in agreement with Prudential's conclusion.[5]  (AR at 235-36). Prudential did not receive a response from Dr. Ungerer.

Also on August 1, Prudential forwarded Dr. Ballarin-Feldman's April 26, 2001 Physical Capacities Evaluation to Dr. Wilhelmina Korevaar, M.D., and asked her to comment on whether that evaluation was still accurate in light of Gammell's updated medical information.  (AR at 511). On August 13, Dr. Korevaar completed an estimation of physical capacities form on which she indicated that Gammell had achieved maximum medical improvement and his physical capabilities were in no way restricted, except for an occasional restriction on driving.  (AR at 514).  Further Dr. Korevaar's report stated that "Gammell should be able to work in a full time capacity in a medium duty capacity with no cognitive limitations."  (AR at 517).

On September 10, Dr. LoPreto completed another addendum report that took into consideration Dr. Lavoie's August 9 addendum, Dr. Korevaar's August 13 evaluation and report,

---

[5] Dr. Ballarin-Feldman's response on this form is perplexing.  The letter also provides: "If you are *not* in agreement with our findings please sign here and return.  Please provide information not previously submitted that would support your conclusion."  (AR at 236) (emphasis added).  The form then has a check line for "No" and signature/date blanks.  Dr. Ballarin-Feldman checked the line for "Yes," and signed and dated the form.  Yet, with the exception of this isolated instance, she has maintained throughout that Gammell was incapable of working. But Dr. Ballarin-Feldman has never claimed that her indication of agreement on this form was the result of careless error or inadvertent accident, which would be unfortunate considering the confusion it caused but understandable.  Instead, plaintiff has explained that "in signing the form, [Dr. Ballarin-Feldman] was only indicating agreement with Lavoie's psych report and not Prudential's conclusion that Mr. Gammell was capable of working."  (Dckt. No. 32-3, Plaintiff's Memorandum in Support of Summary Judgment, at 11.)  This is an unsatisfying explanation, in that the form clearly stated the conclusion with respect to which it was seeking agreement, namely that Gammell is capable of gainful employment.

and Dr. Ungerer's treatment notes covering the period June-August 2002.  Dr. LoPreto concluded that "objective data fails to support the existence of a me[n]tal condition or significant functional impairment that would preclude gainful employment in some capacity.  While Mr. Gammell continues to avail himself of supportive counseling from Dr. Ungerer to address ongoing family stressors, there is no evidence that Mr. Gammell lacks the functional ability to sustain gainful employment in some capacity."  (AR at 522).

### E.      Termination of Disability Benefits and Appeals

On November 4, 2002, Prudential sent a letter to Gammell terminating his long-term benefits.  The letter reviewed the long-term benefits policy, summarized his medical history, summarized the vocational assessments in the record, and concluded that he retained the capacity to perform a wide range of sedentary to medium occupations for which he was qualified and that he no longer satisfied the policy definition of total disability.  (AR at 257-64).

On December 12, 2002, Gammell filed a timely appeal of that decision.  (AR at 278).  In support of his appeal, he underwent additional neuropsychological testing by Dr. Jo Anne Savoie, Ph.D., a clinical psychologist at McLean Hospital in Belmont, Massachusetts, and gathered information and statements from his treating physicians, Dr. Ballarin-Feldman and Dr. Ungerer. On June 7, 2003, Dr. Ballarin-Feldman signed a statement that included the following:

> I have treated Thomas Gammell since at least 1991 as a result of a head injury he sustained in a bicycle accident in 1987.  Mr. Gammell suffers from post-concussive syndrome, which has remained the same since I began treating him.  He also suffers from depression.
>
> As a result of his head injury, Mr. Gammell has suffered a loss of cognitive function.  He is unable to multi-task, has difficulty concentrating, and has a very poor memory.  Based on the many years that I have known and treated Mr. Gammell, it is my opinion to a reasonable degree of medical certainty that he is

disabled and unable to perform gainful employment.

   . . . .

> I do not dispute the scoring of tests, nor do I dispute many of Dr. Lavoie's
> conclusions. . . .  In light of these findings by Dr. Lavoie, I previously indicated
> that I was in agreement with Prudential's conclusions.  However, I strongly
> disagree that these tests indicate that Mr. Gammell is capable of working as a
> shipping order clerk, routing clerk or dispatcher.  My years of treating Thomas
> Gammell and observing his disabilities first hand, in conjunction with my
> experience and education, indicate to me that Mr. Gammell cannot perform the
> duties required by these positions, nor can he adhere to a fixed work schedule.

(AR at 575-76).

   In a synthesis of her findings after administering a battery of neuropsychological tests on

August 14, 2003, Dr. Savoie concluded that Gammell suffered moderate to severe impairments in

a number of areas of cognitive functioning, such as simple and sustained attention, speed of

information processing, and executive controls.  She concluded:

> The nature and severity of his impairments in combination with his psychiatric
> vulnerabilities and recurrent headaches on mental exertion would make it very
> difficult for Mr. Gammell to secure and maintain gainful employment.  His memory
> impairments would interfere with his ability to learn unfamiliar tasks.  Moreover,
> his difficulties in executive/systems would make it difficult for him to follow
> through on instructions, sustain the effort and speed needed to complete tasks at a
> reasonable rate, and think flexibly to meet new or unexpected demands of a task.
> His cognitive struggles would likely result in poor work performance, increasing
> his risk of early termination and further exacerbating his psychiatric vulnerabilities.

(AR at 523-24).

   On December 11, 2003, Dr. Ungerer signed a statement that included the following:

> I first began treating Mr. Gammell in 1991 for his condition.  As a result of the
> [1987] bicycle accident, Mr. Gammell has difficulty concentrating and he is easily
> distracted.  His memory is impaired. . . .   He also suffers from depression and has
> frequent headaches. . . .

Based on my treatment of Mr. Gammell's condition, in conjunction with my education, experience and training, it is my opinion to a reasonable degree of medical certainty that Thomas Gammell is disabled and cannot perform gainful employment. . . .

I strongly disagree with Prudential's conclusion that Mr. Gammell is capable of gainful employment. Specifically, Prudential has determined that my patient is capable of working as a shipping-order clerk, a routing clerk and a dispatcher. I have reviewed the job descriptions and vocational summary prepared by Prudential regarding Mr. Gammell's ability to perform the aforementioned jobs, and in my professional opinion, Thomas Gammell's disability prevents him from performing the tasks required by these positions.

(AR at 529).

On January 15, 2004, Gammell forwarded these statements by Dr. Ballarin-Feldman, Dr. Savoie, and Dr. Ungerer to Prudential, along with a letter describing why this additional information warranted a reversal of Prudential's decision to terminate his long-term disability benefits. (AR at 286-90). Prudential then sought the "raw test data" from the neuropsychological evaluations performed by Dr. Savoie and Dr. Lavoie in 2002 and 2003. (AR at 303). That data was received from Dr. Savoie, but was apparently unavailable for Dr. Lavoie. (AR at 307). Prudential then forwarded the entire claim file to Dr. Margaret O'Connor, Ph.D, a neuropsychologist with Elite Physicians Ltd., for further review. On June 17, 2004, Dr. O'Connor sent Prudential her file review report that noted "significant problems" with the neuropsychological testing by Dr. Lavoie and Dr. Savoie, problems that "confounded the findings and impressions of the examiners." (AR at 556). O'Connor's report stated the following:

From a neuropsychological perspective, there is no evidence that sufficiently documents cognitive deficits.

There is no clear etiology for Mr. Gammell's complaints. His 'deficits' are not compatible with known neurological diseases. . . .

14

Test evidence of impaired performance is discrepant with real life behaviors.  Mr. Gammell continues to drive despite his impaired performance on tasks of divided attention and processing speed (which predict driving competence).  Mr. Gammell has adequate everyday memory and language skills but he performs in the range of the demented and/or amnesic individual on tests.

No tests of effort or malingering were used in Dr. Savoie's evaluation.  Dr. Lavoie notes that Mr. Gammell performed normally on the TOMM and Rey-15 but he does not report specific scores.

(AR at 557).  Dr. O'Connor further concluded that it would be beneficial to review accident and/or emergency room reports from Gammell's 1987 accident as well as the "1989 psychological findings."  Apparently, Prudential attempted to obtain those records, but they were unavailable. (AR at 311).  In addition, Dr. O'Connor completed a MRFC form for Gammell and found that he was not significantly limited in understanding and memory, sustained concentration and persistence, and social interaction and adaptation.  (AR at 542-43).

On July 15, 2004, after reviewing Dr. O'Connor's report, Prudential notified Gammell that it had decided to uphold its original termination decision.  (AR at 309).  On September 14, 2004, Gammell filed a second appeal, challenging Prudential's denial of his initial appeal.  (AR at 321-22).  For the next year and a half, Gammell's second appeal was effectively dormant.[6]  After the parties failed to reach a settlement, the second appeal was reactivated in earnest in March 2006.

On March 24, 2006, Adam Garcia of Prudential's Appeal Review Unit informed Gammell's counsel that Prudential would proceed with its review as of June 1, 2006, based on the

---

[6]  This was apparently due to a number of factors, including repeated transfers of responsibility for Gammell's file between Prudential claims adjusters, Prudential's apparent unawareness that his then-counsel had taken maternity leave and referred her cases to a covering attorney, and settlement discussions between Prudential and Gammell.

information in its file.  (AR at 352).  Despite the time frame suggested by Garcia's letter, a

different Prudential appeals specialist, Tara Johnson, sent Gammell's counsel a letter on

September 15, 2006 that appeared to imply that review of the second appeal was only just

beginning.  (AR at 353).

 In preparing its response to the second appeal, Prudential enlisted the services of Dr.

Robert Mapou, Ph.D., a clinical neuropsychologist, to conduct an independent file review in

September 2006.  (AR at 354-55).  Prudential forwarded the claim file and asked Dr. Mapou to

indicate whether, in his opinion, Gammell was cognitively impaired and, if so, what the cause of

the impairment was and what limitations or restrictions were appropriate.  Meanwhile, frustrated

by the unexplained delay between the agreed-upon start date for review of the second appeal and

the implication of Johnson's letter that review was only just then being initiated, Gammell

commenced this action by mailing a complaint to this Court, which was docketed on October 23,

2006.

 On October 26, Dr. Mapou sent Prudential his claim review report in which he stated that

the neuropsychological testing in 2002 and 2003 showed that Gammell was cognitively impaired

but that "there has been no frank evidence of neurological dysfunction since the initial 1989 EEG.

Thus, at this point, there does not appear to be a neurological basis for the impairment."  (AR at

569).  Apparently in contrast to the successive rounds of neuro*psychological* testing of Gammell

that had been performed since December 2000, Dr. Mapou noted that "there do not appear to

have been any neurodiagnostic studies or a neurological evaluation since 1994."  (*Id.*).

 Further, Dr. Mapou concluded the following:

 The pattern o[f] neuropsychological testing could be consistent with a progressive

neurological condition unrelated to the original injury.  Further neurological evaluation and neurodiagnostic studies would be necessary to determine this. . . .

If the degree of impairment as measured by neuropsychological testing is real and permanent, the Claimant would be unable to work.  However, inconsistencies in the data . . . raise questions as to the validity of the test results, particularly the most recent evaluation.

(AR at 569).  Four days after receiving Dr. Mapou's report, on October 30, 2006, Prudential notified Gammell's counsel that its review of the second appeal was complete and that its decision to terminate Gammell's long-term disability benefits would be upheld.  (AR at 359).

## II.   Analysis

Although summary judgment is ordinarily a procedural tool for screening out cases that do not present trialworthy issues, in ERISA actions it is "simply a vehicle for deciding the issue." *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir. 2005).  This is because "the district court sits more as an appellate tribunal than as a trial court.  It does not take evidence, but instead evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Leahy v. Raytheon Co.*, 315 F.3d 11, 18 (1st Cir. 2002).  As a result, in ERISA benefit denial cases, "the factual determination of eligibility for benefits is decided solely on the administrative record, and 'the non-moving party is not entitled to the usual inferences in its favor.'" *Bard v. Boston Shipping Ass'n*, 471 F.3d 229, 235 (1st Cir. 2006) (quoting *Orndorf*, 404 F.3d at 517).

### A.   Whether Deferential or *De Novo* Review Should Be Applied

A denial of benefits under ERISA is reviewed under a *de novo* standard "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115

17

(1989).  When the plan administrator has been granted such discretion, its decision must be

upheld unless "arbitrary, capricious or an abuse of discretion."  *Diaz v. Seafarer's Int'l Union*, 13

F.3d 454, 456 (1st Cir. 1994).

Here, the relevant plan language is as follows:  "Total Disability exists when Prudential

determines that all of these conditions are met . . . ."  The threshold question presented is whether

that language grants the plan administrator "discretionary authority to determine eligibility for

benefits or to construe the terms of the plan."  *Firestone*, 489 U.S. at 115.

The courts have taken conflicting approaches to the appropriate standard of review in

cases where the relevant plan employs identical (or substantially equivalent) language as the plan

at issue here.  The parties, of course, likewise disagree as to the applicable standard.  Defendants

contend that the plan at issue grants Prudential discretionary authority to determine benefit

eligibility and that the deferential "abuse of discretion" standard should apply.  *See, e.g.*, *Green v.

Prudential Ins. Co. of Am.*, 383 F. Supp. 2d 980, 991 (M.D. Tenn. 2005) ("Both the plain

meaning of the plan and the reasoned analysis of the other district courts lead to the conclusion

that the language 'as Prudential determines' clearly grants discretion to the plan administrator.

Therefore, the arbitrary and capricious standard applies here."); *see also Chapman v. Prudential

Life Ins. Co. of Am.*, 267 F. Supp. 2d 569, 577 (E.D. La. 2003).  Plaintiff, however, contends that

the Court should follow cases reaching an opposite conclusion, and review this matter *de novo*.

*See, e.g.*, *Dickerson v. Prudential Ins. Co. of Am.*, 497 F. Supp. 2d 251 (D. Mass. 2007) (finding

*de novo* review appropriate); *Urso v. Prudential Ins. Co. of Am.* (*Urso I*), 2004 WL 3355265

18

(D.N.H. Nov. 23, 2004) (same).[7]

The difficulty arises from the fact that *all* benefits plans require the administrator to make eligibility determinations, which necessarily requires that the administrator exercise *some* degree of judgment.  The word "determine," therefore, is not synonymous with "exercise discretionary authority."  Thus, in *Herzberger v. Standard Insurance Co.*, 205 F.3d 327 (7th Cir. 2000) (Posner, J.), one of the plans at issue used language that was identical to the plan here.  The court observed that "Obviously a plan will not—could not, consistent with its fiduciary obligation to the other participants—pay benefits without first making a *determination* that the applicant was entitled to them.  The statement of this truism in the plan document implies nothing one way or the other about the scope of judicial review of [t]his determination."  *Id.* at 332 (emphasis added).  Accordingly, it stated, "the presumption of plenary review is not rebutted by the plan's stating merely that benefits will be paid only if the plan administrator determines they are due."  *Id.* at 331.[8]  The court ultimately concluded that the language was not sufficient to require deferential review.  *Id.* at 333 ("The list [of conditions subject to the plan administrator's determination] is made up entirely of objective elements, rather than subjective elements over which discretionary power could be presumed.").

Although the First Circuit has not addressed the issue, it has nonetheless indicated that

---

[7] One consequence of the split in opinion is that beneficiaries of essentially identical plans are treated differently in different jurisdictions— indeed, even for those employees who work for the same company.  *See Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 331 (7th Cir. 2000) (noting that standard of review may change without notice to a beneficiary who is transferred or relocated to a different jurisdiction, even though plan coverage is maintained at all times).

[8] The court suggested the following "safe harbor" language to employers looking to insulate themselves from plenary judicial review of benefit denials:  "Benefits under this plan will be paid only if the plan administrator decides in his discretion that the applicant is entitled to them."  *Herzberger*, 205 F.3d at 331.

implied grants of discretionary authority will not be lightly inferred.  *See Terry v. Bayer Corp.*, 145 F.3d 28, 37 (1st Cir. 1998) ("the grant of discretionary authority must be *clear*") (emphasis added); *Rodriguez-Abreu v. Chase Manhattan Bank, N.A.*, 986 F.2d 580, 583 (1st Cir. 1993) ("The *Firestone* rule has been interpreted to mean that a benefits plan must *clearly* grant discretionary authority to the administrator before decisions will be accorded the deferential, arbitrary and capricious, standard of review.") (emphasis added); *see also Rivera v. Cornell Univ.*, 297 F. Supp. 2d 412 (D.P.R. 2003) (observing that the First Circuit has adopted a "stringent approach" when determining "whether a benefits plan grants sufficient discretion to the administrator as to trigger the deferential 'arbitrary and capricious' standard of judicial review under *Firestone*.").

In accordance with *Herzberger*, at least three district courts in this Circuit have applied *de novo* review to identical (or essentially identical) plan language.  *See Dickerson,* 497 F. Supp. 2d at 253-54 (concluding that because "the plan administrator is to make a judgment within the confines of pre-set standards and does not have the latitude to shape the application, interpretation, and content of the rules in each case, . . . the language is insufficient to trigger deferential review.") (internal quotations and citations omitted); *Urso I*, 2004 WL 3355265, at *3; and *McDonald v. Timberland Co. Group Long Term Disability Coverage Program*, 2002 WL 122382, at *3 (D.N.H. Jan. 23, 2002).[9]

The Court is persuaded that the approach taken by the Seventh Circuit in *Herzberger*, and

---

[9] In *McLaughlin v. Prudential Life Insurance Co. of America*, 319 F. Supp. 2d 115, 124 (D. Mass. 2004), the court applied a deferential arbitrary and capricious review to the same policy language.  However, the court noted that "[t]he parties agree[d] that the Plan unambiguously grants the plan administrator discretion to make benefits determinations and to construe the terms of the Plan."  In light of the agreement of the parties, the *McLaughlin* court did not address the issue.

adopted by other judges in this Circuit, is correct.  Accordingly, the language of the plan at issue here is not a sufficiently clear grant of discretionary authority to trigger abuse of discretion review.  The Court will therefore review the plan administrator's decision *de novo*.

**B.      Whether Prudential's Benefits Determination, Reviewed *De Novo*, Was Correct**

In conducting a *de novo* review, the Court must first determine whether any issues have been raised that are sufficient to warrant judicial action.  Here, the Court has three significant concerns:  (1) the interpretation of Gammell's responses to the December 2000 questionnaire, (2) various apparent gaps or inconsistencies in the medical record that were not acted upon, and (3) the failure of Prudential to articulate clearly why Gammell's status has changed since the original determination.

**1.      Plaintiff's Activities of Daily Living**

One of the factual issues in this dispute arises out of the responses Gammell provided on the claimant questionnaire in December 2000, which prompted the review that ultimately led to the termination of his benefits.  Gammell reported that he was able to drive and shop, and listed various affiliations with local hobby groups and volunteer work.  This led Matikiewicz to conclude that he was "very active" and that "[i]t is unclear why he cannot work." (AR at 165).  It seems clear, however, that Gammell was much less active than Matikiewicz and others believed.  His involvement with the antique auto club and the beekeepers club was minimal and not at all demanding; as to the latter, apparently all of his bees died and the hobby was abandoned in short order.  He reported only that he was trying to learn wood carving and that he got headaches from the effort.  According to the questionnaire, he only shopped for two hours every month, and the

21

volunteer work was light and only done "when needed."

It appears that Matikiewicz, and others, may have based their conclusions, at least in part, on a misunderstanding of Gammell's actual activity levels. This impression that Gammell was very active—which was at best only partially supported by the evidence—appears to have colored future determinations made by later reviewers, particularly Dr. LoPreto, and thus casts a certain degree of doubt on the accuracy on the ultimate determination that he was not disabled.

### 2.      Gaps and Inconsistencies in the Medical Records

The administrative record before the Court is replete with assessments, evaluations, reports, and reviews by multiple professionals across a range of specialties over the course of nearly two decades. Some had the benefit of first-hand contact with the plaintiff, and some did not; others lamented the absence of information they stated explicitly that they would need. Not surprisingly, those professionals reached different conclusions, suggested other avenues for additional evaluation, and occasionally cast aspersions and doubts on the integrity of both the plaintiff and the available data.

To cite but one example, Dr. Mapou, who reviewed the file in 2006, noted the absence of neurodiagnostic studies or neurological evaluation since 1994, suggested the possibility of a progressive neurological condition requiring further evaluation and study, and raised the possibility of permanent impairment, although he also noted inconsistencies in the data. Rather than follow-up on those suggestions and observations, Prudential simply denied the appeal four days later.

The Court does not have relevant medical or scientific training, and is not in a position to evaluate the desirability of additional studies or evaluations. Nonetheless, the Court is not entirely

confident that the professionals upon whom Prudential relied for its decision had a full and appropriate factual basis on which to render their opinions.

### 3.   Lack of Clear Explanation as to Reasons for Change

Finally, the Court notes the absence of any clear explanation as to why Gammell was once deemed entitled to benefits, but is no longer.  His injury occurred in 1987, more than twenty years ago.  Prudential determined in 1989 that he was permanently disabled, and the Social Security Administration agreed with that determination the following year.  It has now reversed field, and has concluded that Gammell can, in fact, work at certain types of positions.  Common sense and logic dictate that at least one of two things must be true:  either (1) the initial diagnosis and determination of total disability were mistaken, or (2) there has been some material change in plaintiff's condition.  Prudential, however, has not explained whether it believed he was never totally disabled in the first place, or whether his condition has materially improved to the point where he is now able to work.

The fact that nearly two decades have passed since long-term benefits were first awarded to Gammell underscores the need for scrupulous care, and a thoughtful explanation, by the plan administrator.  Over time, such a beneficiary may develop settled expectations of receiving those funds, and may be seriously disadvantaged when he attempts to reenter the workforce after a lengthy period of non-employment.  Basic fairness dictates that such a long-standing decision should not be reversed without at least a clear and specific explanation for the change, including an explanation as to why the original conclusion is no longer valid.  Likewise, while Prudential need not accept the opinions of Gammell's treating physicians, it ought to explain in clear terms why it finds them invalid.  Prudential's conclusion may be entirely correct, but it cannot be

properly evaluated without an appropriate and complete explanation of its basis.

In short, the Court is not confident that the correct result has been reached, and therefore declines simply to affirm the decision. The issue then becomes determining an appropriate remedy.

### C.      Remand to the Plan Administrator

Congress vested the Federal courts with broad remedial powers in ERISA cases. "Under ERISA, a court's remedial power 'encompasses an array of possible responses.'" *Bard*, 471 F.3d at 244 (quoting *Glista v. UNUM Life Ins. Co. of Am.*, 378 F.3d 113, 131 (1st Cir. 2004)). In substance, however, and under the circumstances, the Court essentially has two options available to it.

First, it can substitute its judgment for that of the plan administrator and simply reinstate plaintiff's benefits. *See, e.g.*, *Urso v. Prudential Ins. Co. of Am.* (*Urso II*), 532 F. Supp. 2d 292, 302 (D.N.H. 2008) ("De novo review requires the court to determine whether or not the administrative decision was correct and 'allows the court to substitute its judgment for that of the plan administrator.'") (quoting *Marquez-Massas v. Squibb Mfg., Inc.*, 344 F. Supp. 2d 315, 321 (D.P.R. 2004)) (additional internal quotation and citation omitted).

Second, it can remand the matter to the plan administrator for further review. *See Bard*, 471 F.3d at 245-46 ("In other circumstances, it might be an appropriate remedy to remand to a plan administrator for reconsideration."); *Glista*, 378 F.3d at 131 ("[C]ourts have remanded to the plan administrator to consider new factual evidence or plan interpretations presented for the first time to the district court."); *Spanos v. TJX Cos.*, 220 F. Supp. 2d 67, 74 (D. Mass. 2002) ("Remand to the named fiduciary is ordinarily the appropriate remedy when an out-of-court

decision of a claim for benefits under an ERISA-regulated employee benefit plan is subject to judicial review and the reviewing court determines that the process by which the decision was made failed to measure up to the requirements of procedural fairness.") (citing cases).

The decision to remand is committed to the discretion of the district court:

> We have no doubt that in some situations a district court, after finding a mistake in the denial of benefits, could conclude that the question of entitlement to benefits for a past period should be subject to further proceedings before the ERISA plan administrator. . . . [T]he variety of situations is so great as to justify considerable discretion on the part of the district court . . . .

*Cook v. Liberty Life Assurance Co.*, 320 F.3d 11, 24 (1st Cir. 2003).  Remand is frequently the appropriate response where the record does not support the conclusion that claimant is unequivocally entitled to benefits, but only that more information is needed.  While there are constraints on the district court's consideration of new evidence that was not before the plan administrator when reviewing an eligibility determination in an ERISA action *de novo*, *Liston v. UNUM Corp. Officer Severance Plan*, 330 F.3d 19, 24 (1st Cir. 2003), "[r]emanding a case to the plan administrator to consider the additional evidence or to further develop the record offers an alternative solution," *Jorstad v. Connecticut Gen. Life Ins. Co.*, 844 F. Supp. 46, 55 (D. Mass. 1994) (citing cases).  Similarly, the Second Circuit has endorsed remand to the administrator where the court was unable to "conclude that [plaintiff's] claim *necessarily* should have been granted" as it did "not find that, upon the receipt of additional evidence, a reasonable fiduciary could only have granted the claim." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1073 (2d Cir. 1995) (emphasis added); *see also Dizoglio v. Digital Equip. Corp. Disability Income Protection Plan*, 1999 U.S. Dist. LEXIS 21778, at *41 (D.N.H. July 23, 1999) ("While it is unlikely that the Committee will ultimately award disability benefits to Dizoglio, because I cannot

25

conclude that no reasonable factfinder could find for Dizoglio, I must remand the case for further review.").

Here, the Court is not prepared to make a definitive judgment about plaintiff's eligibility for long-term disability benefits without more information. That is particularly true given the gaps in the evidence, the conflicting medical evaluations, and the disputed manner in which the resulting data were interpreted and applied by successive physicians, psychologists, and vocational specialists. "[T]he problem is not that [claimant] was denied benefits to which he was clearly entitled; the evidence does not compel such an outcome. The problem is with the . . . decision-making process." *Buffonge v. Prudential Ins. Co. of Am.*, 426 F.3d 20, 31 (1st Cir. 2005).[10]

Accordingly, and rather than directing Prudential to reach a different result, the Court will remand the case to the plan administrator for further review. On remand, and in order to ensure that the review is consistent with this opinion, defendant is directed to undertake the following. First, the review must be independent, including (as appropriate) medical, psychological, and vocational review and analysis by well-qualified professionals with no previous involvement in this case. Second, it must attempt to assess plaintiff's actual daily activity levels with a reasonable degree of accuracy. Third, all records, tests, and other data deemed necessary by the reviewing professionals, including raw data as necessary, must be made available to them. Fourth, if defendant concludes that plaintiff is capable of gainful employment, it must clearly articulate not only the basis for that conclusion, but also the reasons for the change from the original

---

[10] As the court noted in *Buffonge*, this characterization of the process is not meant to suggest that the Court believes "that Prudential intentionally set up a biased process." 426 F.3d at 32 n.15.

determination.  Finally, if defendant rejects the opinions of plaintiff's treating physicians, it must articulate clear reasons for doing so.

The Court hastens to add that it is not directing defendant to reverse its decision, or otherwise to rule in plaintiff's favor.  Upon further review, it may well prove to be the case that he is not, in fact, entitled to long-term disability benefits.  That decision, however, will await another day.

The Court will retain jurisdiction pending Prudential's review on remand.  *See Spanos*, 220 F. Supp. 2d at 75 n.11 ("The preferred course of action is for the Court to retain jurisdiction over the matter but not to enter a final judgment.") (citing *Maida v. Life Ins. Co. of North America*, 949 F. Supp. 1087, 1094 (S.D.N.Y. 1997)).

### III.   Conclusion

For the foregoing reasons, the motions of plaintiff Thomas Gammell and defendant Prudential Insurance Company of America for summary judgment are DENIED.  The case is remanded to the plan administrator for further review in accordance with this decision.

**So Ordered.**

                            /s/ F. Dennis Saylor
                            F. Dennis Saylor IV
                            United States District Judge

Dated: September 25, 2008